■ SIG BUCHMAYR NEW YORK, INC., Respondent, v. EASTERN AIR CONDITIONING CORP., Defendant-Appellant and Third-Party Plaintiff-Appellant. ALFRED KATZ et al., Doing Business under the Name of AL-WES ELECTRIC SHOP, Third-Party Defendant-Respondent, et al., Third-Party Defendant.

*Per Curiam.* Plaintiff Sig Buchmayr New York, Inc. has recovered $11,420.50 for property damages based on breach of contract and negligence in the installation of an air conditioning system which caused a flood in its basement. The question is whether there is sufficient evidence to support the jury verdict in favor of store-owner Buchmayr against defendant-appellant Eastern Air Conditioning Corp. and against Eastern on its claim over against third-party defendant-respondent Al-Wes Electric Shop.

Because the evidence establishes that it was defective installation and not an excessive rain which caused the flooding of the store-owner's basement, and because the air-conditioning contractor did not establish that the defect was

due to the fault of the electrical subcontractor rather than itself, it is concluded that the judgment entered on the jury verdict should be affirmed in all respects.

On April 4, 1961 Eastern contracted with Buchmayr to install an air conditioning system in Buchmayr's new Manhattan sporting goods store. The air conditioning compressor unit was installed on the street level of the store, but the remainder of the equipment which cooled the circulating air was installed in the basement. In the basement were an air circulating blower, cooling tower, water circulating pump, and sump pump. The air, circulated through the store by the blower, was cooled in the cooling tower which utilized cold water. The circulating pump forced the water through the compressor unit and the cooling tower. A float valve mechanism automatically controlled the influx of fresh water into the system to replace impure water which was drained off. Also, whenever the cooling units were stopped by thermostatic control, the circulating pump also stopped, and the water in the pipes going upstairs to the compressor flowed down into the cooling tower and overflowed. Therefore there was "bleed off" and overflow into a drain pan at the foot of the cooling tower. This water was periodically pumped into the sewer drain by the sump pump.

The contract with the store-owner Buchmayr required Eastern to perform the following electrical work: "Connect the air conditioner, cooling tower, and circulating pump to the existing electric service in your store. Connections shall be made in such a manner that the cooling tower and pump motors will start automatically whenever the air conditioning compressor starts." It also required Eastern to "Start up this system and check out operation."

Eastern orally subcontracted the electrical work to Al-Wes, which had done other similar jobs for Eastern. Al-Wes connected the air conditioner, cooling tower, circulating pump, and blower into a 208-volt system so that they operated together automatically. The sump pump required a 110-volt current and was already equipped with a wire and male plug. Al-Wes simply plugged it into a 110-volt receptacle already on the wall alongside the 208-volt system electrical boxes which it had installed. It was later learned that the electrical current to this receptacle went on and off dependent on the switch for the basement lights, instead of being controlled by the air conditioning system and its automatic devices. In other words, the sump pump did not automatically work along with the rest of the system when the basement lights were off.

On the morning of June 23, 1961, a layer of one to two inches of water was discovered on the basement floor. Eastern attempted to prove it was due to a heavy rain the night before, but the proof clearly shows all of the rain had occurred and stopped the previous day. The conclusion is inescapable that the light switch had been turned off the previous evening and, since the sump pump did not work with the light switch off, water poured out of the drain pan onto the floor. There was also corroborating evidence that the basement lights were not meant to be on after store hours and there was expert testimony concerning the amount of water that would overflow under the temperature conditions of that night. Therefore, the jury verdict against Eastern in favor of Buchmayr is abundantly substantiated.

Moreover, the jury was also correct in concluding that the electrical subcontractor, Al-Wes, was not responsible to Eastern for the failure to connect the sump pump so it would operate automatically with the other components. The Al-Wes witness testified Al-Wes was instructed by Eastern to connect the air conditioner, cooling tower, circulating pump and blower into one system so they would operate together, but was told simply "to wire" what the witness called the "condensate" pump, i.e. the sump pump.

As stated earlier the 110-volt sump pump was already equipped with a wire and plug and there was a 110-volt receptacle handy. The testimony shows that the 110-volt sump pump could have been connected to the 208-volt system by utilizing a neutral wire along with only one of the three live wires which were in the 208-volt cable. However, this 208-volt cable did not have the usual neutral wire, and it would have been necessary to install one.

Furthermore, the word "condensate", used by the witness to describe the sump pump is the very term used to describe the sump pump in the contract between Eastern and Buchmayr. The Al-Wes witness appropriately described such a pump as follows: "A condensate pump, as I contracted to wire, handles * * * the condensation of water that collects in the air conditioner. As warm humid air passes over the cooling coils, water being warm hitting a cold space condenses. This water has to go somewhere, so it drips down, goes through a pipe and drops into a condensate pump. This in turn dispels this water, gets rid of it." This is certainly a normal interpretation. It is reasonable to conclude that Al-Wes thought the sump pump was truly meant to dispel only a small amount of condensate water and not large quantities of overflow and "bleed off" from water actually utilized as a coolant in the particular type of air conditioning system employed. There is no evidence to indicate that Al-Wes knew or should have known the nature of this particular air conditioning system or that it utilized large amounts of water. It does not even appear that the float valve which automatically actuated the sump pump was visible. Indeed, the instructions given Al-Wes and all appearances indicated that this sump pump was merely an auxiliary device used occasionally to pump a small amount of condensate water, rather than a major component of an integrated system which was required to work frequently and automatically.

The contract with Buchmayr imposed on Eastern the responsibility of starting and checking the system. Eastern's president testified that he did not inspect every wire, and relied on Al-Wes. An Eastern mechanic who answered two or three previous complaints about smaller quantities of water on the basement floor, did not detect the faulty wiring. Of course, the basement lights would be on when the unit was inspected, and the sump pump would then work. If the air-conditioning expert did not know enough to check the wiring, it is simply parallel to the electrical expert's lack of sufficient knowledge to check the train of functions among the air-conditioning components, in the absence of any showing that either should or did know better.

But, the testimony indicates Eastern should have detected the defect. One expert who testified in detail how the system should have been wired was an air-conditioning expert — in the same field as Eastern. The inference is inescapable that Eastern should have possessed the same information which, under the circumstances, was not, on this record, available to Al-Wes.

It may not be assumed, without proof, that an electrician, even a very expert electrician, must know how the several parts of this particular air conditioning system worked, or that an electrician, however competent, is supposed to know without detailed installation instructions or wiring diagrams how to install an air-conditioning system, especially where functional parts are concealed. Moreover, while Al-Wes had done similar jobs for Eastern before, there was no evidence that the prior jobs involved the same type of system or details of installation that this one did. The standard male plug and wire of the sump pump operable on standard 110-volt current was a misleader to any but the informed. That the sump pump was to operate automatically on actuation by a concealed float valve was not a self-evident circumstance even to an expert electrician, or, at least, this record does not so establish.

Accordingly, the judgment should be affirmed, with costs to plaintiff-respondent and third-party defendant-respondent, in each instance against defendant-appellant.

Botein, P. J., Breitel, Valente, McNally and Steuer, JJ., concur.

Judgment unanimously affirmed, with costs to respondents.